**NATIONWIDE MUTUAL INSURANCE COMPANY, Plaintiff,**

v.

**AMERICAN REINSURANCE CO., Defendant.**

**No. C–2–86–1158.**

United States District Court, S.D. Ohio, E.D.

Aug. 7, 1991.

William Tignal McCracken, Crabbe, Brown, Jones, Potts & Schmidt, Columbus, Ohio, for Nationwide Mutual Ins. Co.

David L. Day, David L. Day, L.P.A., Columbus, Ohio, for American Reinsurance Co.

## MEMORANDUM AND ORDER

HOLSCHUH, Chief Judge.

### I.

This is a diversity case which involves an issue of reinsurance. Nationwide Mutual Insurance Company, the plaintiff, provided both a special multi-peril insurance policy and an umbrella policy to AAA Employment, Inc., an employment agency. It reinsured 90% of the coverage provided under the umbrella policy with defendant American Reinsurance Company. In 1984, Nationwide paid a $1 million judgment which had been entered by a Florida state court against AAA Employment in a personal injury action. In this suit, it seeks to require American to reimburse it for 90% of the amount paid pursuant to the umbrella policy, and for the expenses it incurred in defending the lawsuit. American claims that AAA Employment's conduct that led to the judgment was excluded from coverage under the umbrella policy, and that even if coverage existed, Nationwide did not timely request reinsurance payment.

The parties have submitted summary judgment motions, exhibits, and deposition transcripts on these two issues. The motions are ripe for decision. For the reasons that follow, the court concludes that Nationwide's umbrella policy did not provide coverage for the specific claim made against AAA Employment, and therefore American is not obligated to Nationwide under the reinsurance agreement.

### II.

The salient facts of this case are somewhat lengthy but not overly complicated. There does not appear to be any dispute about the facts which, in the court's view, are material to the issues presented by the summary judgment motions.

The story began in 1979 when Nationwide issued a "Special Multi-peril (SMP) Policy" and a "Commercial Umbrella Liability Policy" to AAA Employment, Inc. and John and Gloria DeHaven of St. Petersburg, Florida. The SMP policy, which is not at issue in this case, had a general liability limit of $300,000. Nationwide did not reinsure any of that risk. The umbrella policy provided for an additional $1 million of liability coverage. The terms of that policy, and particularly endorsement number 5 thereto, are crucial to this case.

In general, the umbrella policy provided for an additional dollar amount of coverage for risks which were covered by the underlying SMP policy. However, there were endorsements to the umbrella policy which excluded coverage for some risks which were covered under the SMP policy. The one at issue here is endorsement number 5, which reads in full as follows:

#### EMPLOYMENT AGENCY ERRORS AND OMISSIONS EXCLUSION

It is agreed that this policy does not apply to liability for any acts, errors, or omissions of the Insured or by any other person for whose acts the Insured is legally liable, in the conduct of the Insured's business of an Employment Agency.

Without going into detail, the evidence supports the proposition that this endorsement was added to the umbrella policy after conversations about errors and omissions coverage between Nationwide and American.

On September 14, 1979, shortly before Nationwide issued the umbrella policy to its insured, American issued a "Facultative Reinsurance Quote–Binder." In the "remarks and conditions" section of the binder, American notes that the umbrella policy "excludes pollution, contractual, auto liability, CCC-real, employment agency E & O

[errors and omissions].'' American ultimately issued a "Certificate of Facultative Reinsurance" on November 2, 1979. The general conditions of that certificate state, in pertinent part, that:

"The Reinsurer agrees to indemnify the company [Nationwide] against losses or damages which the company is legally obligated to pay with respect to which insurance is afforded during the term of this Certificate under the policy reinsured, subject to the reinsurance limits and coverage shown in the Declarations."

The underlying SMP policy, the umbrella policy, and the reinsurance agreement were all in effect on May 10, 1980.

On May 9, 1980, a prospective employer called AAA Employment. He said his name was Jay Blackwell, that he was a magician, and that he was performing at a magician's convention being held at the Holiday Inn in West Palm Beach, Florida the next day. He asked for a female to work as his assistant that day, and said he would pay $150 for her services. AAA called Fannie Krueser, who had previously sought work through the agency, and gave her that information. She came into the agency, was given an introduction card, and was instructed to call "Mr. Blackwell" the next afternoon at the Holiday Inn.

Ms. Krueser ultimately arranged to meet "Mr. Blackwell" in his room at the Holiday Inn on May 10. As soon as she entered the motel room, she was struck on the head, tied up, and raped by "Mr. Blackwell," whose real name was Paul Votta. Votta was subsequently convicted of sexual battery by force, aggravated battery, false imprisonment, and robbery in connection with this attack.

Alleging that AAA had been negligent in failing to respond appropriately to the suspicious circumstances under which "Mr. Blackwell" had requested an employee, Fannie Krueser sued AAA and Nationwide in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida. Nationwide accepted the defense of AAA and retained counsel in Florida to defend the case. On April 27, 1984, a jury returned a verdict in favor of Ms. Krueser in the amount of $1 million. Approximately two weeks after the verdict was returned, Nationwide advised American for the first time that it had been presented with a claim for payment under the umbrella policy and that it would expect American to pay 90% of that claim under the reinsurance agreement. Nationwide subsequently paid the the judgment, allocating the first $300,000 to the SMP policy and the balance, or $700,000, to the umbrella policy. It asked American to reimburse it for $630,-000 (90% of $700,000) plus its costs of defense. American declined, primarily on grounds that the events described in Ms. Krueser's complaint were excluded from coverage under the umbrella policy by endorsement number 5. American continues to maintain that position, and also asserted, as a defense to this lawsuit, that Nationwide did not timely notify it of the potential that it would be obligated to perform on the reinsurance contract, since its first notice of the existence of Ms. Krueser's claim came after the jury verdict was entered in her favor. The parties' motions present those two issues for the court's consideration.

### III.

Fed.R.Civ.P. 56(c) provides:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original); *Kendall v. The Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984).

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. The purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir.1978). Therefore, summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, ... [and where] no genuine issue remains for trial, ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *accord, County of Oakland v. City of Berkley*, 742 F.2d 289, 297 (6th Cir.1984).

In making this inquiry, the standard to be applied by the Court mirrors the standard for a directed verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

> The primary difference between the two motions is procedural: summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745, n. 11 [103 S.Ct. 2161, 2171, n. 11, 76 L.Ed.2d 277] (1983). In essence, though, the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Accordingly, although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555 (quoting Fed.R.Civ.P. 1).

In a motion for summary judgment the moving party bears the "burden of showing the absence of a genuine issue as to any material fact, and for these purposes, the [evidence submitted] must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970) (footnote omitted); *accord, Adams v. Union Carbide Corp.*, 737 F.2d 1453, 1455–56 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). Inferences to be drawn from the underlying facts contained in such materials must be considered in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Watkins v. Northwestern Ohio Tractor Pullers Association, Inc.*, 630 F.2d 1155, 1158 (6th Cir.1980). Additionally, "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. *Adickes*, 398 U.S. at 157–60, 90 S.Ct. at 1608–10; *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979).

If the moving party meets its burden and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Anderson*, 477 U.S. at 251, 106 S.Ct. at 2511. As is provided in Fed.R.Civ.P. 56(e):

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If

he does not so respond, summary judgment, if appropriate, shall be entered against him.

Thus, "a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion made against him." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 259, 88 S.Ct. 1575, 1577, 20 L.Ed.2d 569 (1968) (footnote omitted).

### IV.

Two distinct contractual relationships underlie this dispute. The first is the contract entered into between Nationwide and American as evidenced by the "Certificate of Facultative Reinsurance." There is no dispute about the significance of that contract. It obligates American to perform on its reinsurance obligation if Nationwide was required to pay a liability incurred by AAA Employment for actions or inactions covered under the commercial umbrella policy. Consequently, the scope of coverage provided under that policy is the key question.

The insurance contract was issued in Florida to a Florida resident. The parties appear to agree that Florida law should be used to determine the scope of coverage provided under the umbrella policy. Consequently, the court begins with a discussion of applicable Florida insurance law.

■ Florida law conforms to that of most other American jurisdictions with respect to the general principles applicable to the interpretation of insurance policies. When the policy is construed by the court, doubts are generally resolved in favor of coverage and against exclusion. Thus, "[w]here a term in an insurance contract is ambiguous, the courts will construe the policy language in favor of the insured and against the insurer." *Quality Imports v. St. Paul Fire and Marine*, 566 So.2d 293, 295 (Fla.App.1990), review den. 576 So.2d 290 (Fla.1991). Moreover,

"Florida law is well-settled that exclusionary clauses are construed more strictly than coverage clauses. [Citation omitted]. Exclusionary clauses that are ambiguous or otherwise susceptible of more than one meaning must be construed in favor of the insured. [Citation omitted]. This general doctrine is tempered, however, by the rule of reason and the principle that even insurance policies must be given practical, sensible interpretations in accordance with the natural meaning of the words employed." *Allstate Ins. Co. v. Shofner*, 573 So.2d 47, 49 (Fla.App.1990).

■ Exclusionary clauses are construed strictly because "[a]n insurance policy cannot grant rights in one paragraph and then retract the very same right in another paragraph called an 'exclusion.'" *Tire Kingdom, Inc. v. First Southern Ins. Co.*, 573 So.2d 885, 887 (Fla.App.1990). This does not mean, however, that the court should adopt unreasonable interpretations of insurance policy provisions simply in order to find coverage. Thus, where a provision of a policy "is not ambiguous ... there is no occasion for employing the rule of construction against the insurer, and the court simply applies the plain meaning of the provision." *Quality Imports v. St. Paul Fire and Marine*, 566 So.2d at 295. Similarly, the failure to express an exclusion from coverage "in the clearest language possible" is not the same as an ambiguity, as long as the wording of the exclusionary clause is sufficiently clear to permit the court to determine its plain meaning. *Allstate Ins. Co. v. Shofner*, 573 So.2d at 49.

■ These general principles provide the backdrop against which endorsement number 5 of the umbrella policy must be construed. As stated above, the endorsement excludes, by its title, coverage for "employment agency errors and omissions," and defines them in the language of the endorsement itself as "acts, errors or omissions of the Insured" or its agents "in the conduct of the Insured's business of an employment agency." Since the particular acts or omissions upon which AAA Employment's liability to Fannie Krueser was predicated were referring her to a prospective employer without properly performing a background check or other investigation

of the employer, the question is whether that sequence of acts and omissions are properly described as "acts, errors, or omissions of the Insured ... in the conduct of the Insured's business...."

In the Court's view, endorsement number 5 unambiguously excludes coverage for AAA Employment's act of referring Fannie Krueser to an employer, and its error or omission in failing to investigate the circumstances of the proposed employment engagement. From the words employed in the policy itself, it was clearly Nationwide's intent to exclude from coverage liabilities arising out of acts unique to conducting the business of an employment agency. Although the phrase "business of an employment agency" may not have a precise meaning, and although there may be some acts or omissions which would not fall unambiguously within a reasonable construction of the phrase, it must refer to those activities which distinguish the business of an employment agency from other businesses. The business of an employment agency consists, in substantial part, of developing lists of persons interested in employment, and lists of employers with employment opportunities, and taking steps to match the two. Ms. Krueser's name was known to AAA Employment through the conduct of that portion of its business which involves learning about people who want jobs. "Mr. Blackwell" came to the attention of the agency directly as a result of that part of its business which requires learning about employers who want employees. The referral of Ms. Krueser to "Mr. Blackwell" was quintessentially the act of an employment agency. The failure to investigate Mr. Blackwell was, according to the verdict reached by the Florida jury, the breach of a duty imposed upon AAA Employment and its agents solely by virtue of the fact that AAA and its agents were conducting the "business of an employment agency."

Simply put, if the liability in this case was not excluded by endorsement number 5, it is difficult to conceive of any set of facts giving rise to liability which would fall within this exclusion. Surely, both Nationwide and its insured understood that something—some sequence of acts or failures to act—was being excluded from coverage under the umbrella policy by the inclusion of endorsement number 5. American, of course, had that same expectation. Finding no ambiguity in the language employed as it relates to the facts of this case, and giving the words their plain meaning in accordance with the reasonable and common-sense expectations of the parties, the Court concludes that the umbrella policy did not provide coverage to AAA Employment for the liability which it incurred to Fannie Krueser.

The parties have not cited, and the Court has been unable to find, any cases which construe an errors and omissions exclusion as it relates to the business of an employment agency. However, American has cited a number of cases from jurisdictions with the same general approach to insurance law as Florida which fully support the conclusion reached by the court.

The commonly-understood nature of errors and omissions insurance was explained in *Albert J. Schiff Associates, Inc. v. Flack,* 51 N.Y.2d 692, 435 N.Y.S.2d 972, 976, 417 N.E.2d 84, 88 (1980) in these words:

> "An errors and omissions policy is intended to insure a member of a designated calling against liability arising out of the mistakes inherent in the practice of that particular profession or business [citation omitted]."

If that is an accurate description of errors and omissions insurance, then a policy excluding errors and omissions coverage would logically exclude liabilities arising out of actions "inherent in the practice of that particular profession." That is an apt phrase to describe the acts and omissions which formed the basis for Fannie Krueser's suit against AAA Employment.

This understanding of the purpose of errors and omissions coverage appears to be common in the insurance industry as well, as evidenced by Exhibit 5 to Nationwide's memorandum, which is an excerpt from an insurance industry publication.

That excerpt states, among other things, that:

"Persons or organizations that render professional services face an additional liability exposure—the failure to use due care and the degree of skilled [sic] expected of a person in a particular profession. Insurance for this exposure is known variously, and without complete consistency, as professional liability insurance, malpractice insurance, *or errors and omissions liability insurance....* [E]rrors and omissions liability is usually limited to non-medical professions...." [Emphasis supplied].

In opposition to this line of analysis, Nationwide cites no cases, but offers the affidavit of George A. Vaka, a Florida attorney who practices insurance law. Mr. Vaka's affidavit states, in part, that under Florida law, Nationwide would not have been able successfully to deny coverage under its commercial liability policy, and that in Florida, errors and omissions coverage is available only to persons who practice a calling which requires a license, specialized knowledge, and academic preparation including at a minimum a four-year university level degree in some field of study. Since coverage is available only for such limited professional activities, Mr. Vaka opines that an exclusion of such coverage would be similarly limited, and would not have permitted Nationwide to use the exclusion in the policy to deny coverage to AAA Employment.

■ There are a number of reasons why the Court cannot accept Mr. Vaka's affidavit as persuasive. First, of course, expert testimony on matters of law is generally not admissible, it being the court's task to determine issues of law for itself rather than to depend upon those who profess to be legal experts. *See Shahid v. City of Detroit,* 889 F.2d 1543 (6th Cir.1989); *United States v. Zipkin,* 729 F.2d 384 (6th Cir.1984). Second, Mr. Vaka's opinion is just that—an opinion. Like Nationwide, he cites no case law in support of his position, and the court believes that the case law, even from Florida, does not support so restrictive an interpretation of the scope of either errors and omissions coverage, or errors and omissions exclusions.

Nationwide's argument seems to rest on the premise that the phrase "errors and omissions" has a specialized meaning apart from whatever language is used in the policy or exclusion to describe the scope of coverage either being offered or being excluded. That is not the law. Even if insurers understand phrases such as "errors and omissions" to have some specialized meaning, it is the reasonable interpretation of such language by the lay person to whom coverage is either being provided or excluded that provides the basis for interpretation of such policy language. Further, the exclusion in this case does not simply say "no coverage for errors and omissions." It states, in terms which the court has concluded to be unambiguous, that acts, errors or omissions in the course of performing those services unique to the business of an employment agency are excluded from coverage. Consequently, whatever specialized meaning the phrase "errors and omissions coverage" may have, this policy exclusion is written in sufficiently broad and plain English to cause AAA Employment's actions to fall within its scope.

Nationwide also seems to argue that it is never appropriate to characterize a calling such as the conduct of an employment agency as a "profession," and that as a matter of law one cannot exempt the activities of something which is not a "profession" from coverage using any of the language employed in endorsement number 5. That proposition has no legal support. For example, Florida has recognized that "professional services" can be rendered by people who are not members of a profession which require extensive education and state licensing. Malpractice insurance covering ambulance attendants was the subject of discussion in *Merrill v. Packard,* 395 So.2d 285 (Fla.App.1981). *Buckner v. Physicians Protective Trust Fund,* 376 So.2d 461 (Fla.App.1979) discussed, without hesitation, the scope of coverage provided under an indemnity policy which, although it covered doctors, provided insurance not for their medical practice but for actions

taken in their capacity as members of accreditation boards. Other states have clearly recognized that almost any business or calling can enjoy attributes of a "profession." *See, e.g., Hollingsworth v. Commercial Union Ins. Co.*, 208 Cal.App.3d 800, 256 Cal.Rptr. 357 (1989) (concluding that ear-piercing by a jewelry salesperson is a "professional service"); *Multnomah County v. Oregon Automobile Ins. Co.*, 256 Ore. 24, 470 P.2d 147 (1970) (defining a professional act or service as "one arising out of a vocation, calling, occupation or employment involving specialized knowledge, labor, or skill, and the labor or skill is predominantly mental or intellectual rather than physical or manual" and concluding that the act of a jail medical technician in failing to provide insulin to an inmate was the failure to render a professional service); *Knorr v. Commercial Casualty Ins. Co.*, 171 Pa.Super. 488, 90 A.2d 387 (1952) (holding that "the technical work performed by beauticians, hair-dressers, etc." fell within the description of professional services). Based upon those cases, and upon general Florida insurance law principles, the Court does not hesitate to conclude that a reasonable person would describe an employment agency as rendering professional services, and that performing or not performing precisely those services led to AAA Employment's liability to Fannie Krueser.

Nationwide also argues, and supports with Mr. Vaka's affidavit, the proposition that AAA Employment's actions in this case fall within the description of the "completed operations hazard" which, everyone agrees, was insured under the umbrella policy. It is sufficient to say that the "completed operations" language by no means clearly includes in the policy scope, absent exclusions, the type of activity which occurred in this case, and that even if it did, the clear language of endorsement number 5 negates any coverage for this particular "completed operation."

## V.

Although the Court's conclusion in this case is based upon a simple interpretation of the plain language of the policy exclu-

sion, the Court believes it is important to acknowledge other arguments advanced by the parties and to explain, briefly, why they have no bearing on the Court's reasoning. Both parties have submitted deposition testimony from the persons at Nationwide and American who discussed inclusion of the errors and omissions endorsement, and what those persons did or did not intend by suggesting such an exclusion and by including it into the policy. In particular, Nationwide argues that Philip Conti, who wrote the exclusion, has stated under oath that he did not intend the exclusion to apply to facts such as those presented by the *Krueser* case.

In the Court's view, such evidence is irrelevant where the policy is unambiguous. It may well have been Mr. Conti's subjective intention, had he actually considered this set of facts prior to issuing the policy, to provide coverage under the umbrella policy. In fact, had he expressed such an intention to the insured, and then written policy language to the contrary, his expressed intention might well have estopped Nationwide from denying coverage. That is not the issue here. Whatever may have occurred in Nationwide's relationship with AAA Employment which led Nationwide to make a payment under the umbrella policy is irrelevant to the issue of American's obligation to Nationwide as a reinsurer, because American's obligation is limited to reinsuring the obligation *which is described by the terms of the umbrella policy.* Consequently, the Court's only focus can be on the coverage provided, as a matter of law, by the words selected for inclusion in the policy, even if those words directly contradict the intent of Nationwide's agent in writing the policy and an express understanding between Nationwide and the insured concerning the scope of the policy. Unless it could be shown that American agreed not only to reinsure the risks evident from the face of the policy itself, but additional risks which Nationwide had otherwise become legally obligated to insure against, American would have no liability where the policy language excluded coverage. That is this case.

American has also advanced a number of arguments attempting to explain why Nationwide may have made a payment under the umbrella policy which it was not obligated to make, and why it may have chosen to pursue a claim for reinsurance rather than a claim against its own errors and omissions insurer. Again, however, such arguments are not relevant. The issue is not why Nationwide may have made payment under the umbrella policy, but whether it was obligated *by the policy* to do so. For example, Nationwide may have perceived itself to have waived any denial of coverage under the umbrella policy by not giving its insured a timely notice of reservation of rights. American plausibly suggests that Nationwide never issued such a reservation of rights of notice because of miscommunication among its various offices and its failure to perceive, when the lawsuit was filed, that the recovery could be sufficiently high so as to exhaust the SMP policy limits and trigger umbrella coverage. All of that may be true, and Nationwide may have incurred a legal obligation to pay under the umbrella policy for precisely those reasons. Whether Nationwide made a payment because of some obligation arising outside of the four corners of the policy, or whether it simply made a payment by mistake, and whether such mistake triggered its own errors and omissions insurance coverage, are immaterial to the outcome of this case, which turns upon an analysis of Nationwide's obligations under the policy. Those obligations, as the Court has concluded, did not include the obligation to make a $700,000 payment on account of the judgment rendered in the *Krueser* case.

The parties have extensively briefed the question of whether Nationwide's notice to American concerning the possibility of reinsurance coverage is timely. Those arguments turn upon the very specific facts of this case, as reflected in the evidentiary materials filed, and upon the disposition of a disputed question of state law. Because the Court is able fully to dispose of this case for the reasons decided above, it perceives no need to decide unnecessarily a somewhat thorny state law issue concerning the timeliness of the notice given.

## VI.

For the foregoing reasons, the Court HOLDS that endorsement number 5 of the Commercial Umbrella Liability Policy issued by Nationwide Mutual Insurance Company to AAA Employment Agency, Inc. excluded coverage for the acts which resulted in AAA Employment, Inc.'s $1 million liability to Fannie Krueser. That being the case, American's motion for summary judgment is meritorious and it is therefore GRANTED. This case is DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment in favor of the defendant.